Ralph Kenneth **ROYER**, Appellant,

v.

Deborah Kown **ROYER**, Appellee.

No. 09–02–201 CV.

Court of Appeals of Texas, Beaumont.

Submitted Jan. 2, 2003.

Delivered Jan. 23, 2003.

---

G. Mark Creighton, Darden, Fowler & Creighton, LLP, Conroe, for appellant.

E.M. Schulze, Jr., Schulze & McDonald, LLP, Woodlands, for appellee.

Before McKEITHEN, C.J., BURGESS and GAULTNEY, JJ.

## OPINION

PER CURIAM.

This is an appeal from the denial of a motion to modify the amount of child support ordered to be paid by appellant (petitioner below), Ralph Kenneth Royer. The trial court conducted a hearing at which both Mr. Royer and appellee, Deborah Kown Royer, testified. Various documents reflecting the financial status of the parties were also introduced into evidence for the trial court's consideration. Mr. Royer raises a single appellate issue, *viz:* "Did the trial court abuse [its] discretion in denying a modification of child support?"

We review a trial court's decision to deny, or grant, a motion to modify a child support order for an abuse of discretion. *See Worford v. Stamper,* 801 S.W.2d 108, 109 (Tex.1990); *Nordstrom v. Nordstrom,* 965 S.W.2d 575, 577–78 (Tex.App.-Houston [1st Dist.] 1997, pet. denied). The test for abuse of discretion is whether the court acted arbitrarily or unreasonably, that is without reference to guiding rules and principles. *Id.* at 578. In making this determination, we must view the evidence in the light most favorable to the actions of the trial court and indulge every legal presumption in favor of the judgment. *Id.* We must uphold the trial court's decision as long as there is some evidence of a substantive and probative character to support its decision. *Id.*

A trial court may modify a prior child support order if "the circumstances of the child or a person affected by the order have materially and substantially changed since the date of the order's rendition." TEX. FAM.CODE ANN. § 156.401(a)(1) (Vernon 2002). In determining whether there has been a material and substantial change in circumstances, it is well settled that the trial court must compare the financial circumstances of the

children and the affected parties at the time the existing support order was entered with their circumstances at the time the modification is sought. *See Farish v. Farish*, 921 S.W.2d 538, 541 (Tex.App.-Beaumont 1996, no writ); *Tucker v. Tucker*, 908 S.W.2d 530, 532 (Tex.App.-San Antonio 1995, writ denied); *Penick v. Penick*, 780 S.W.2d 407, 408 (Tex.App.-Texarkana 1989, writ denied). Nevertheless, it is the best interest of the child that is always the trial court's primary consideration when it determines questions of child support. *Tucker*, 908 S.W.2d at 532–33. Therefore, the trial court retains broad discretion in making the equitable decision of whether to modify a prior support order. *Lindsey v. Lindsey*, 965 S.W.2d 589, 593 (Tex.App.-El Paso 1998, no pet.).

 In his brief, Mr. Royer directs our attention almost exclusively to his income tax returns for the years 1996 and 2001. Mr. Royer seems to base his appellate argument on the simple fact that his income for 1996, the year of the divorce, was significantly greater than his income for 2001, the year he filed the motion to modify. We decline to accept this narrow view of the evidence a trial court may consider in determining whether a material and substantial change has occurred and what is in the best interest of the child. The financial ability of Mr. Royer to pay child support does not depend solely on current earnings, but extends to all sources that might be available. *See Clark v. Jamison*, 874 S.W.2d 312, 317 (Tex. App.-Houston [14th Dist.] 1994, no writ); *Musick v. Musick*, 590 S.W.2d 582, 586 (Tex.Civ.App.-Tyler 1979, no writ). Furthermore, it is proper for the trial court to take into consideration the value of a party's property, even though it is not producing income, because the party may be required to dispose of assets in order to meet his support obligations. *See Penick*,

780 S.W.2d at 410; *Labowitz v. Labowitz*, 542 S.W.2d 922, 926 (Tex.Civ.App.-Dallas 1976, no writ).

The evidence before the trial court, taken in the light most favorable to its ruling, indicated that Mr. Royer's income was essentially based upon what he chose to pay himself from his business. Furthermore, while Mr. Royer testified at one point that he did not receive a salary, at another point in the hearing his direct examination testimony indicated the following:

Q.[Mr. Royer's Counsel] In fact, in 1999, your personal income was what?

A.[Mr. Royer] 178,509 dollars.

Q. That's just the employment or wages that your business made; is that correct?

A. That's correct.

Q. Your Sub S income, you also made an additional amount; is that correct?

A. That's correct.

Q. How much was that?

A. For Sub S, 137,961 dollars.

Q. In 1999, you made over 300,000 dollars?

A. That's correct.

During cross-examination of Mr. Royer, Mrs. Royer's trial counsel introduced Respondent's Exhibit 2, a summary of Mr. Royer's federal income tax returns for the years 1991 through 2001. The figures are set out as follows:

| Year | Adjusted Gross Income |
|------|------------------------|
| 1991 | $123,362 |
| 1992 | $270,445 |
| 1993 | $406,356 |
| 1994 | $558,448 |
| 1995 | $353,707 |
| 1996 | $ 95,452 |
| 1997 | $ 41,573 |
| 1998 | $135,515 |
| 1999 | $325,695 |
| 2000 | $ 70,453 |
| 2001 | $ 35,239 |

As Respondent's Exhibit 2 also indicated, over the past eleven years, Mr. Royer's

adjusted gross income averaged out to be $219,658 per year, and since 1996, the year of the divorce, his adjusted gross income averaged out to be $121,695 per year. Mr. Royer's testimony characterized his income as having "dropped pretty dramatically since 1996." This was apparently due to the fact that his business, Lifestyle Sports, Inc., lost three of its top accounts: Nike Swimwear—lost in the first quarter of 2000; Starter Corporation—lost sometime in 1999; and Anwand—lost in 1998. Yet, in the midst of this seemingly drastic downturn in his personal income since 1996, Mr. Royer purchased a new home in February 2000, for approximately $530,000, with approximately $385,000 still owing.

The confusion was evident on the part of the trial judge as he began questioning Mr. Royer regarding the timing of the purchase of the new house:

THE COURT: When did you buy this house?

[Mr. Royer]: 2000, February of 2000.

THE COURT: If your business was in trouble and you said it's been going downhill for several years, why would you obligate yourself on a 350,000 dollar, almost half a million dollar house when you don't have the money to pay for it?

[Mr. Royer]: Your Honor, when I made the commitment, the prior year before I started having the home built, I made 178,000 dollars, was my income, and based on that, I could afford to make that decision. I wasn't aware at the time that one of the companies I represented was going to file bankruptcy and another one was going to make the decision to bring its sales force in-house, internally; otherwise, had I known that, I wouldn't have made that decision.

THE COURT: What year did you say that was?

[Mr. Royer]: That what was, Your Honor?

THE COURT: That you made 174,-000 dollars?

[Mr. Royer]: I believe it was 1998.

THE COURT: So in 1998, you made 174,000 dollars and you built the house in the year 2000. What did you make in '99?

[Mr. Royer]: Your Honor, I could be wrong. Sometimes I guess the years. The 178,000 could have been in '99, and I believe the prior year I made 116,000 dollars.

Regardless of what year he began building the new house, it is clear from Mr. Royer's previous testimony that by February of 2000, he had lost two of the three major accounts (Starter and Anwand) and even possibly Nike Swim as that was lost in the "first quarter" of 2000. The record before us appears to indicate that while Mr. Royer's business lost three major accounts, he continued to make significant discretionary expenditures in his personal life. For example, Respondent's Exhibit 3 lists dues payments to the Woodlands Country Club from October 27, 2000, through December 29, 2001. These payments averaged $212.02 per month. Respondent's Exhibit 4 lists Mr. Royer's liquor expenses dating from January 28, 2000, through December 11, 2001. This averaged out to $312.63 per month. Respondent's Exhibit 5 indicates that Mr. Royer's pool and yard maintenance expenses for the period from September 10, 2000, through December 29, 2001, averaged $190.65 per month. Most telling are the expenses reflected in Respondent's Exhibit 8 which includes the amounts Mr. Royer spent in furnishing his new house. The earliest date listed in this exhibit is February 17, 2000, and the final date listed is January 3, 2002. The total amount

spent for furnishings during this roughly two-year period which Mr. Royer previously testified was very bad financially for both himself and his business is listed as $28,732.66.

Additionally, testimony of Mr. Royer indicated that in January of 2001, he purchased a fur for his wife from Sakowitz for $4,319. Lastly, we cannot ignore the fact that Mr. Royer, as the sole shareholder in Lifestyle Sports, Inc., was free from time to time to take "draws" from the business for his own personal use. It should also be noted that Mr. Royer personally and solely decided when to "fund" his personal pension plan, and at the time of trial his pension fund totaled approximately $380,000.

Although Mr. Royer's earned income at the time of the original support order in 1996 was higher than his listed income at the time of the filing of the motion to modify, considering his overall financial resources and assets, we find that the trial court did not abuse its discretion in maintaining the child support at the amount reflected in the divorce decree. Mr. Royer simply failed to carry his burden of proof that a material and substantial change in circumstances had occurred so as to justify a reduction in his monthly child support obligation. Mr. Royer's appellate issue is overruled. The trial court's denial of the motion to modify is affirmed.

AFFIRMED.